Filed 5/5/16 P. v. Stratis CA2/5
On remand

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B229255 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA083187) |
| v. | |
| CHRISTOPHER STRATIS et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Mike Camacho, Judge. Affirmed and remanded with instruction.

Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant Christopher Stratis.

Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant Victor Manuel Maurtua, III.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, David E. Madeo, Deputy Attorney General, for Plaintiff and Respondent.

In 2013, this court considered the appeals of defendants and appellants Christopher Stratis and Victor Manuel Maurtua III. Each challenged the judgment corresponding to their convictions for first degree murder (Pen. Code, § 187, subd. (a)).[1] Defendant's were sentenced to life in prison without the possibility of parole (LWOP) because the jury found the murder was perpetrated during the commission of a burglary (§ 190.2, subd. (a)(17)(G)).

Stratis and Maurtua both contended there was insufficient evidence to support the burglary-murder special circumstance finding and both maintained their LWOP sentences constituted cruel and/or unusual punishment under the state and federal Constitutions. Stratis also argued the trial court improperly imposed a parole revocation fine.

We reversed Stratis's sentence of LWOP and remanded the matter for resentencing with adherence to the guidelines set forth in *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455].[2] We additionally ordered the trial court to recalculate Stratis's presentence credit award and modified the judgment against Maurtua to omit a parole revocation fine. In all other respects, the judgments were affirmed.

The California Supreme Court initially granted the petitions for review filed by the Attorney General and Stratis. Thereafter, the Supreme Court transferred review to this court for reconsideration in light of *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*)—a case explaining the requirement that a defendant who is an aider and abettor to a murder must have conducted himself as a major participant with reckless indifference to human life in order to justify a finding that the he committed the murder under a special circumstance, e.g., during a burglary. The Supreme Court order directed as follows: "In

---

[1]    All further statutory references are to the Penal Code.

[2]    The year after we filed our opinion, the California Supreme Court held *Miller* applies to California's sentencing scheme such that it "requires a trial court, in exercising its sentencing discretion, to consider the 'distinctive attributes of youth' and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders' before imposing life without parole on a juvenile offender. [Citation.]" (*People v. Guiterrez* (2014) 58 Cal.4th 1354, 1360-1361.)

the event the Court of Appeal determines defendant David Stratis's burglary-murder special circumstance is supported by substantial evidence, the matter should be remanded to the trial court for resentencing of Stratis in light of the guidelines set forth in *People v. Guiterrez* (2014) 58 Cal.4th 1354."

We hold Stratis's conduct qualified him for special circumstance punishment and therefore, as directed by the Supreme Court, we remand the matter to the trial court for resentencing.

## THE EVIDENCE[3]

### A.    A Home Invasion Robbery is Planned and Executed

Christopher Santana told Christine Alegre (Victor Maurtua's cousin) that he wanted to invade the Hong home when the occupants were present and that he had been watching the home for a while. He explained his ex-girlfriend lived in the home but expressed concern that her brother was "kind of buff." Santana suggested committing the robbery while his ex-girlfriend and her brother were home—he indicated he could tie up the brother and place him in a closet with his ex-girlfriend.

On March 19, 2008, Alegre and her friend Magali Fernandez were picked up at Alegre's home by Santana and Maurtua. Santana was driving a van. They proceeded to Ontario to pick up Christopher Stratis. On the trip home the three men spoke about committing a home invasion robbery.

Santana stopped the van near the home of Stratis's foster mother in Duarte. Stratis wanted to break into the safe in the home. The three men got out of the van and put on latex gloves. One of them was carrying a backpack. They abandoned their plan when they noticed people were home. Stratis said, "We're going to have to come back."

---

[3]    This section is lifted verbatim from our opinion in *People v. Christopher Stratis et al*, B229255.

Santana drove the van past the Hong home. A car was exiting the driveway. Santana commented: "[O]h, this is the house. . . . [L]ook how big this house is." Santana said, "Okay, we're going to do this right now because the gate is open." The three men exited the van. Santana took a backpack containing a Glock .40-caliber semiautomatic handgun and covered his face with a bandana. Stratis covered his head with the hood of his black sweatshirt. All three men put on latex gloves.

The three men entered the garage of the Hong home. Santana continued inside the house while Stratis and Maurtua stayed in the garage. Shots were fired in the home— Santana had shot Hong three times while she was speaking to a 911 operator. One of her wounds was "rapidly" fatal. The men fled the scene.

Alegre had driven the van away but returned to pick up the men when she received a phone call from Santana. Stratis was quiet and remained calm for the remainder of the day. Santana got into the driver's seat of the van and drove it past the Hong home. They observed an ambulance and police cars. Alegre asked, "Did you hurt somebody?" Santana replied, "What do you think?"

The group stopped by Santana's home. The three men exited the van and returned a few minutes later. Alegre asked Santana, "Who did you shoot?" Santana responded, "Some bitch." The group proceeded to Maurtua's residence where they sat in the backyard for a brief time.

With the assistance of a police dog, officers followed defendants' trail to a road nearby the Hong home. They recovered two pairs of surgical booties, discarded clothing including a black hooded sweatshirt, and a backpack containing a loaded Glock .40- caliber semiautomatic handgun and a crescent wrench.

## B. The Police Interviews of Stratis and Maurtua

Maurtua and Stratis were interviewed by police detectives. Their interviews were played for their respective juries only. A summary of the relevant portions of the interviews follows.

### 1. Stratis

Stratis referred to Santana by his moniker "Vicious" and said Santana was "crazy" given the "way he looks and the way he acts towards people." Stratis was contacted by Santana the night before the home invasion robbery and agreed to do a "house lick," i.e., a home invasion robbery.

They initially stopped near a house in Duarte. The men exited the car with gloves on but abandoned the idea of going into the house because a female was observed in the window and there was a daycare next to the home.

When they reached the Hong home, Maurtua provided Stratis with gloves. Santana had a backpack. Stratis had the hood to his sweater over his head. The three men jumped over a wall and entered the Hong garage through a side door. Stratis heard gunshots and fled. His two companions caught up to him and the three men jogged to a dead end street. The men discarded many items during their flight— Santana threw his backpack, Maurtua dropped the gloves and Stratis took off his black "hoodie" sweater. Santana called one of the girls in the van. The van arrived, the men entered it, and Santana drove it away.

### 2. Maurtua

Maurtua knew Santana was associated with an El Monte criminal street gang and had the moniker "Vicious." Prior to committing the crime at the Hong residence, Santana spoke to Maurtua about Santana's participation in home invasion robberies. Santana described the crimes as "[J]ust freakin' simple." Santana said he had been to a party at the Hong home and that it was a "big house." He explained the girl who lived

there had a brother who was "kind of buff" but that, if the girl and the brother happened to be home, he would "just kill them."

When the men exited the van at the Hong home, Maurtua saw Santana holding a backpack. Maurtua confirmed all three men put on latex gloves and that Santana had a bandana over his face. After the men jumped a fence, Santana unzipped the backpack and removed a gun. Maurtua was shocked. As Santana was entering the home with the gun in his hand, Maurtua observed Hong walk by and look in their direction. Maurtua heard Hong calling 911 and then heard the gunshots. Santana exited the home, unzipped the backpack and placed the gun inside of it. He tossed the backpack away as they fled the scene. After the men reached the van, Santana said he shot Hong because she saw him.

## DISCUSSION

### A.      The *Banks* Case and Its Guidelines

An aider and abettor to first degree murder, i.e., not the actual killer, is subject to a penalty of LWOP if the jury finds true one of several special circumstances. In this case, the applicable special circumstance is murder during the commission of a burglary. Certain rules determine the constitutionality of such punishment if the aider and abettor did not have the intent to kill. Under these circumstances, an LWOP sentence for an aider and abettor is constitutionally permissible only if that person was a "major participant" in the crime who acted with "reckless indifference to human life." (*Banks*, *supra*, 61 Cal.4th at pp. 797-798.)

*Banks* applied these rules to assess whether there was sufficient evidence an aider and abettor to a murder (Lovie Matthews) was properly sentenced to LWOP. (*Banks*, *supra*, 61 Cal.3d at pp. 804-812.) The evidence demonstrated Matthews participated in the burglary of a marijuana dispensary with three confederates, one of whom was Leon Banks. Matthews was the driver of the car. He dropped his cohorts off near the

6

dispensary and waited approximately three blocks away for about 45 minutes. During the burglary, Banks shot and killed one of the security guards of the dispensary. Just a few moments after the shooting, Banks called Matthews and Matthews responded by driving toward the dispensary. Matthews was eventually flagged down by two of the burglars (not Banks) who entered the vehicle. The three men drove off. The police arrived and captured Banks on foot near the dispensary. (*Id*. at pp. 795-796, 804-805.)

*Banks* held the evidence that Matthews was a major participant in the offense was "insufficient to find the special circumstance true and Matthews eligible for [LWOP] under state law." (*Banks*, *supra*, 61 Cal.4th at p. 805.) It rejected the notion that he was a major participant in the offense for the following reasons: "No evidence was introduced establishing Matthews's role, if any, in planning the robbery. No evidence was introduced establishing Matthews's role, if any, in procuring weapons. . . . [N]o evidence was introduced that Matthews [or the two men he picked up after the shooting] had themselves previously committed murder, attempted murder, or any other violent crime. . . . During the robbery and murder, Matthews was absent from the scene, sitting in a car and waiting. There was no evidence he saw or heard the shooting, that he could have seen or heard the shooting, or that he had any immediate role in instigating it or could have prevented it." (*Id*. at p. 805, fn. omitted.) *Banks* summed up Matthews's role as "no more that a getaway driver." (*Ibid*.)

*Banks* then turned to the issue of whether Matthews's mental state demonstrated a reckless indifference to human life and applied the following rule: "Reckless indifference to human life 'requires the defendant be "*subjectively aware* that his or her participation in the felony involved grave risk of death."'" [Citations.]" (*Banks*, *supra*, 61 Cal.4th at p. 807.) *Banks* held, although there was evidence Matthews knew he was participating in an armed robbery, "nothing at trial supported the conclusion beyond a reasonable doubt that Matthews knew his own actions would involve a grave risk of death." (*Id*. at p. 807.) As a result, the mens rea component necessary to uphold the

7

special circumstance and concomitant LWOP sentence was, like actus reus, also lacking.

### B.      The Application of *Banks*

Unlike Matthews**,** Stratis's participation was far greater than that of a mere getaway driver.  Stratis was involved in substantial planning and participation.  He was contacted by Santana the night before the crimes were committed.  This contact was not from any ordinary person—Santana was known by his moniker "Vicious" and Stratis considered him to be "crazy."  Stratis must have reached an agreement with Santana as the following day Stratis was picked up in a van containing Santana and Maurtua and the three men discussed the intended home invasion target.  They initially selected the home of Stratis's foster mother because Stratis knew there was a safe inside and wanted to break into it.  Santana and the two men donned latex gloves and exited the van but, because people were seen in the home, it was Stratis who instructed, "We're going to have to come back."

When they reached the Hong home, the men operated together and attempted to avoid identification—Maurtua put on a white bandana, Stratis pulled the hood up on his sweatshirt, and all three men wore latex gloves.   Stratis and Maurtua jumped a fence with Santana and the three men entered Hong's garage together.  Stratis was present at the scene, operated to avoid detection, and provided security/protection for the shooter.  After gunshots rang out, Stratis fled with the gunman and left Hong to die.

In sum, Stratis's involvement in the crimes greatly exceed that of Matthews.  Stratis participated in planning the home invasion robbery, knowingly teamed up with a man with the moniker of "Vicious," took a leadership role by directing the group away from the first target, and was present at the scene of the shooting.  We turn now to mens rea.

Some of the same facts illustrative of Stratis's participation in the crimes, also indicate Stratis knew his actions involved a grave risk of harm to others.  Most importantly, Stratis elected to commit the home invasion robbery with a man known as

8

"Vicious" (Santana) and described by *Stratis himself* as "crazy." This seemingly-considered sadistic mad man was, certainly to no surprise of anyone, armed with a gun. Indeed, there was evidence that the gun was visible in Santana's hand when he entered the home.

There are other non-overlapping circumstances indicative of the requisite mens rea. There was no evidence anyone made any attempt to ensure the home was empty. To the contrary, the evidence suggested someone was in the home—the gate was open when the men arrived at the scene and, thereafter, Hong looked through a window, in the direction of Stratis and Maurtua, just before she was gunned down by Santana.

We have no difficulty distinguishing the mental state of Stratis from that of Matthews and concluding that a rational trier of fact could have found Stratis acted with reckless indifference to human life.

## DISPOSITION

The case is remanded to the trial court for resentencing of Christopher Stratis pursuant to guidelines set forth in *People v. Guiterrez* (2014) 58 Cal.4th 1354.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORT


KUMAR, J.[*]


We concur:


TURNER, P. J.


KRIEGLER, J.

_____

[*]      Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

10